NELLIE JOBE ET AL. (SHELL PETROLEUM CORPORATION ET AL.) V. MRS. KATE B. OSBORNE ET AL.

No. 6712. Decided November 12, 1936.
Rehearing overruled January 20, 1937.
(97 S. W., 2d Series, 939.)

510

*Fulbright, Crooker & Freeman* and *C. A. Leddy,* of Houston, for Nellie Jobe and others; *Thompson, Mitchell, Thompson & Young,* and *W. K. Koerner,* of St. Louis, Mo., *P. G. McElwee,* of Houston, *Lacy & Molhusen,* of Longview and *Black & Graves,* of Austin, for Shell Petroleum Company, all for plaintiffs in error.

This being a statutory action in trespass to try title plaintiff must recover, if at all, on the strength of their own title. Plaintiff failed to prove title to any land whatever and the court should have therefore directed a verdict for defendants and should have granted defendant's motion for judgment and

refused to enter judgment for plaintiffs. Bruce v. Washington, 80 Texas, 368, 15 S. W., 1104; Tate v. Waggoner, 149 S. W., 737.

Defendants having been permitted to introduce in evidence a conversation between Mr. Beall and Humphrey Lockhart alleged to have been had after Lockhart had been in possession of this property for seventeen years, during twelve of which years his possession was under deed, it was error for the court to refuse to submit a special issue telling the jury that if the title once vested under the ten year statute of limitation no statement of Lockhart's or any other defendant would have the effect to divest the title. Harris v. Mayfield, 260 S. W., 835; Brown v. Fisher, 193 S. W., 361.

In the absence of any proof that court records have been destroyed, it must be presumed that ancestor left a will appointing an executor and conferring power to sell land without an order of the court and the record of the probation of such will still exists. Recitals in a deed, however ancient, can not take the place of court records which presumptively still exist. 17 Tex. Jur., 724, sec. 310; Lagow v. Glover, 77 Texas, 448; House v. Brent, 69 Texas, 27.

*Karl A. Crowley,* of Fort Worth and *Wynne & Wynne,* of Longview, for defendants in error.

Proof of admission by one in possession of land to the effect that he had encroached upon said land in error because he was mistaken as to the true boundary of his own tract; of his willingness to move his own improvements from said land; that he had not had time to do so; that he had been sick and might not be able to attend to the matter but that if he did not his folks would after his death, such admissions although made after title might have matured by limitation, were admissible to prove the character, of the position held by occupant of the land as to whether it was adverse to the true owner, and when considered in the light of supporting facts and circumstances is evidence upon which the jury may find as a fact that the land was not held under a claim of right and adverse to the claim of all persons. Bracken v. Jones, 63 Texas, 184; Smith v. Robertson, 235 S. W., 847; Johnson v. Wise, 272 S. W., 296.

The authority of an independent executor to sell land will be presumed from recitals in an ancient deed to the effect that the land sold was a part of testator's at the time of his death and that by the will the signer of the deed is made executor of

the estate with full power to settle up said estate at his own discretion and without reference to an order of the probate court, and that said sale was made pursuant to that object and for the purpose of meeting the indebtedness of the deceased. French v. McGinnis, 69 Texas, 19; Republic Production Co. v. Lee, 95 S. W. (2d) 1053; Tucker v. Murphy, 66 Texas, 359.

MR. JUDGE HICKMAN delivered the opinion of the Commission of Appeals, Section A.

Defendants in error were plaintiffs and plaintiffs in error were defendants in the trial court. For convenience we shall employ the trial court's designation. In the trial court plaintiffs, Kate B. Osborne and others, were awarded the title and possession of 20.33 acres of land out of the P. W. Warraner Survey in Gregg County in an action of trespass to try title brought by them against the defendants, Nellie Jobe and others. The Court of Civil Appeals affirmed the judgment of the trial court. 68 S. W. (2d) 375. The defendants pleaded not guilty and the three, five, ten and twenty-five years statutes of limitation. Defendant Nellie Jobe is the remarried widow of Humphrey Lockhart, deceased. The defendant, Wallace Jobe, is Nellie Jobe's present husband. The other defendants except The Shell Petroleum Company, are the children of Humphrey Lockhart and his wife, Nellie, now Nellie Jobe.

In support of their claim of record title plaintiffs introduced the following evidence:

1st. Patent from the State of Texas to P. W. Warraner, dated August 26, 1848. By the field notes of this patent the south line of the survey is 2008 vrs.

2nd. Deed dated February 22, 1867, from P. W. Warraner to James R. Oliver. This deed contains the same description as that in the patent, but the following clause is added:

"The above described tract of land is the undivided one-half of the 320 acres of Phannell W. Warriner Headright."

3rd. Deed dated February 10, 1872, from S. Slade Barnett as executor of the estate of J. R. Oliver, deceased, to W. H. Leach, conveying 30 acres "more or less, if any," out of the Warraner survey. That deed contains the following recitals:

"Being a part of the land owned by J. R. Oliver, at his death and bequeathed by him to Lillie Beall, and her daughter, Emily, in his last will and testament, in which will the said Slade Barnett is made executor of the estate with full power to settle up said estate at his own discretion and without reference to the Court of the County and with authority to sell all

or any part of his property to discharge the debts of the said Testator and this sale is made in pursuance of that object and to meet the indebtedness of the said deceased."

4th. Will of Martha Ann Leach.

5th. Testimony of plaintiff Mrs. Mary Patton Beall, showing that she and plaintiff Mrs. Kate Osborne take under the will of Martha Ann Leach.

For descriptive purposes only plaintiffs offered additional deeds which will not here be listed.

■ The first question presented is one of boundary. In order for the plaintiffs to recover it was necessary for them to establish that the true distance between the S. E. and S. W. corners of the Warraner survey is not 2008 vrs. as called for in the patent, but that it is, at least, 2170 vrs. A careful consideration of the evidence has convinced us that plaintiffs wholly failed to meet this burden, from which it follows that the trial court erred in not sustaining the defendants' motion for peremptory instruction at the conclusion of the plaintiffs' testimony. A discussion of the evidence offered on this question would extend this opinion to a great length, and, because there are other grounds upon which the motion should have been sustained, and our judgment does not rest on this ground alone, we find it unnecessary to discuss it.

■ The next question presented is one of title. In order to support their claim of title plaintiffs offered in evidence, among other instruments, a deed from S. Slade Barnett, purporting to act as executor of the estate of J. R. Oliver, deceased, to W. H. Leach. That deed recites that Barnett is executor of the estate of J. R. Oliver with full power to settle up said estate, the full recitals being copied above. No proof was made that Oliver was dead; that he left a will; that Barnett was his executor or that the will, if any there was, empowered Barnett to make this conveyance. Neither was proof made of an order of court admitting such a will to probate, or of the fact that the probate records had been lost or destroyed.

The general rule is that, where an ancient instrument purports to have been executed under a power, the existence of that power will be presumed, but it will not be presumed where it must emanate from a court whose proceedings are required by law to be entered of record, unless it be shown that the records have been lost or destroyed. Tucker v. Murphy, 66 Texas, 359, 1 S. W., 76; French v. McGinnis, 69 Texas, 19, 9 S. W., 323; Hill v. Templeton, 29 S. W. (2d) 535; James v.

Gaal, 282 S. W., 298; Spencer v. Levy, 173 S. W., 550; 17 Tex. Jur., 724, Sec. 310.

■ The Court of Civil Appeals recognized this rule, but held that it is subject to the qualification that recitals of authority contained in an ancient deed purporting to have been executed by an independent executor are presumed to be true. No basis for such qualification is perceived, for one purporting to act as an independent executor has no more power under an un-probated will than one claiming to act as an administrator has without an order of court appointing him as such adminis-trator. The authority of each must be evidenced by a court order required by law to be made a matter of record. In sup-port of its holding the Court of Civil Appeals cited the cases of Sydnor v. Texas Savings, etc., Assn., 42 Texas Civ, App., 138, 94 S. W., 451 and Schramm v. Hoch, 241 S. W., 1087. The recitals in the executor's deed in the Sydnor case were not of facts required to be of record. The Schramm-Hoch case seems not to be in point. The trial court erred in overruling defend-ant's motion for peremptory instruction on the ground that plaintiffs failed to prove title to the land.

We have held that for two reasons the trial court erred in refusing to grant the motion for peremptory instruction. Were these the only questions presented, it might be contended that we should remand the cause for another trial, rather than ren-der judgment here, on the ground that it does not clearly ap-pear that the case, as to these questions, has been fully de-veloped. But on another question, that of limitation, the case has been fully developed and the evidence establishes con-clusively the right of defendants to have this litigation brought to an end.

On that question the evidence may be summarized as fol-lows: By deed dated November 26, 1888, Leona Hicks conveyed to Calvin Brown and Humphrey Lockhart, as tenants in com-mon, a tract of land containing 120 acres off of the W. side of the Warraner Survey. In 1889 Humphrey and Nellie Lockhart went into possession of the E. part of this tract, including the land here in dispute. They cut the timber and built a house on this 20 acre tract and put a portion of it in cultivation. During his lifetime, Humphrey Lockhart built three succes-sive houses thereon and since his death his heirs have built a fourth house. He built a fence along the entire E. side, which remained there until the construction of a public road, which now runs along that line. He planted an orchard and pecan

trees. A photograph accompanies the record showing that pecan trees planted by him are now very large trees. It appears without dispute that Humphrey Lockhart until his death in 1924, and after him his heirs, were in actual, open, peaceable and continuous possession of this property for more than 40 years prior to the filing of this suit, planting and cultivating a crop thereon each and every year and paying taxes (sometimes after delinquency) on the amount of land which they thought was in their tract. In 1895 Calvin Brown and Humphrey Lockhart partitioned the 120 acre tract which they owned in common. Lockhart had theretofore occupied the E. one-half, but no partition deeds were passed until 1895. By these deeds Lockhart conveyed to Brown the W. one-half of this tract and Brown conveyed to Lockhart the E. one-half. The deed from Brown to Lockhart covers and includes the land in dispute. It was further shown that by deed dated January 15, 1901, W. E. Beall, husband of plaintiff Mary Patton Beall, and executor of the Leach estate, conveyed to Humphrey Lockhart a certain tract of land, the description of which was in part as follows:

"Beginning at a large pine tree near his residence; thence W. 257 vrs. to a sweet gum for a corner * * *."

The words "near his residence" found in this description clearly mean Lockhart's residence. This deed calls for the same witness trees as being at Lockhart's corners that are called for in the partition deed from Brown to Lockhart. It was further shown that on January 7, 1907, W. E. Beall and wife, Mary Patton Beall, conveyed a certain tract of land out of the Warraner Survey to one T. H. Huffman, in which deed was the following recital: "The same being the remaining portion of the 238 acre tract conveyed to me by Kate Osborne et al on the 21 day of November, 1900." After the execution of this deed neither Mr. Beall nor any of the plaintiffs ever rendered any land for taxation in the Warraner Survey or paid any taxes thereon. Lockhart at all times owned other lands than the little 20 acre tract in dispute, upon which he could have built his home and planted his orchard and pecan trees. From time to time he acquired additional tracts until in 1901 he owned all the land surrounding this tract.

The only evidence offered by plaintiffs to rebut this very convincing showing of title by limitation was the testimony of two witnesses to conversations which took place many years ago between W. E. Beall and Humphrey Lockhart, both of whom are now deceased. Plaintiffs do not deny the long use

and possession of this land by Humphrey Lockhart and his heirs, but rely alone upon the contention that their possession was not under a claim of ownership. One of the witnesses offered by them was Walter Beall, son of W. E. Beall, and plaintiff Mrs. Mary Patton Beall. He testified that on an occasion in 1907 or 1908 he accompanied his father to the Lockhart home on the premises in dispute and heard a conversation between his father and Humphrey Lockhart. The essence of his testimony is reflected in the following excerpts therefrom:

"Q. What did your father say to Humphrey Lockhart about his house being over the line?

\* \* \*

"A. He told Lockhart he had built his house over the line a short distance.

"Q. What did Humphrey Lockhart tell him?

"A. He told him he had built it through a mistake; that he thought his line was down there.

"Q. What was said with reference to moving it, if your father wanted him to?

"A. Yes, sir; he was agreeable to moving it.

\* \* \*

"Q. He would move it if your father wanted him to?

"A. Yes, sir, no specific time.

\* \* \*

"Q. What did he say with reference to why he put it there?

"A. He said he put it there through an error.

"Q. What did he say about claiming the land?

"A. He said he was not claiming it."

### CROSS-EXAMINATION.

"Q. What was said? I would like for you to tell the jury everything that was said by either party down there.

"A. I don't know; I don't recall all the conversation. I do know there was no controversy.

"Q. Just tell what was said.

"A. Lockhart said 'if he was over his line, he was willing to move the house back on his line.'

"Q. He said 'if he was over his line, he was willing to move back'?

"A. Yes, sir.

"Q. He never did tell your father, in your presence, that he knew he was over his line?

"A. I don't know that he remarked that he did.

"Q. Mr. Beall told him that he was over his line?

"A. Yes, sir.

"Q. And the negro said, 'If I am over, I am willing to get off'?

"A. Yes, sir.

* * *

"Q. The only thing the negro said about whether or not he claimed it was, 'If I am over, Mr. Beall, I will move over'?

"A. Yes, sir.

"Q. He never did say, 'I know I am not on my line, but on your property, and I am not claiming this property where my house stands'?

"A. He did not tell me that.

"Q. You did not hear him tell your father?

"A. Not in those words.

"Q. Did you hear him say anything other than, 'If I am over your line—if I am—I will get off'? If he said anything other than 'If I am over the line, I will get off if you ask me to' * * *?

"A. He told him that.

"Q. Did you hear him tell him anything else about knowing whether or not he was on or off of it?

"A. I don't know.

"Q. Did you hear him?

"A. I did not hear him; no, sir."

Another witness offered by plaintiffs was a colored man named Andrew Taylor. He testified to conversations overheard by him between Mr. Beall and Humphrey Lockhart. The testimony of this witness is somewhat incoherent. The following excerpts therefrom are believed fairly to reflect its essence:

"He came down there—I was in the garden, the old man was sick at that time; he was walking out where I was and he walked up to where I was working in the garden, looking at me, and Mr. Beall came up and commenced talking—I was busy, don't know what all was passed between them, but before this was mentioned, but they stayed there and talked for some little bit and I heard Mr. Beall call his attention about having that business fixed up; what they would do about it being on the wrong side over there, and as well as I remember, he told Mr. Beall, well, he said, 'I have been putting that off, I am down sick now, ain't able to do nothing; if I don't get if fixed before I die my wife will tend to it'; something like that.

"Q. Now, Andrew, after this first conversation in 1914 or 1915, when did you—did you hear them talking together any more about it?

* * *

"A. The last talking they done about it was just before the old man died; that was when they was up there at the garden.

"Q. When did the old man die?

"A. He died in '24, July 8th.

"Q. Were they making any claim to any land as far as you know except the land covered by that deed from Calvin Brown?

"A. That was all.

* * *

"Q. At the time you and Humphrey and Mr. Beall were talking the last time or the first time or on any other occasion, did Humphrey make any claim to the Leach or the Beall land?

"A. No, sir.

"Q. Any land claimed by Mr. Beall?

"A. No, sir; he didn't claim any land belonging to Mr. Beall or anybody. He was a man that didn't want nothing but his. I never knew him to claim nothing that belonged to anybody else.

* * *

"Q. Andrew, did you ever hear of any of the Lockharts setting up any—* * * any claim to this land until this oil boom hit here?

"A. No, sir.

"Q. Did you hear of any of them claiming it until the Shell became interested in this lease?

"A. Well, they claimed the land that was on their boundary lines; they claimed that, but so far as claiming any land that belonged to anyone else, I didn't know of them claiming any land that belonged to anybody else at all."

### CROSS-EXAMINATION.

"Q. All right; some one of this family, Humphrey, his wife or his children, raised a crop on this particular land each and every year, didn't they?

"A. Yes.

"Q. From the time they moved there until this good day, haven't they?

"A. Well, yes, sir; they have cultivated it.

"Q. They cut the timber off of there and sold it and had it cut off?

"A. Yes, sir, the timber is cut off.

"Q. That was done by Humphrey and his family?

"A. Yes, sir.

"Q. Did you ever hear of Mr. Beall or anybody else objecting to the sale of that timber?

"A. Well, where they are living now, they claimed all that was up there.

"Q. Who did?

"A. Humphrey.

"Q. That is right?

"A. And there was no timber there only right on the back of where the barn is now, right down the fence; nobody ever set up any claim or any objection to the timber that they used that I know of.

"Q. They had a fence on the east side of this land, east of the house where they lived all these years, and that fence was where the new road now goes?

"A. Yes, sir.

"Q. Humphrey and his wife or some of them put that fence there, didn't they?

"A. Yes, sir, he put it there.

* * *

"Q. You don't know, but you do know there has been a fence on the east side of this twenty acres for years and years, don't you?

"A. Yes, sir.

* * *

"Q. That fence on the east side that we were talking about, where the road is now, was what Humphrey and his wife claimed to be their east boundary line, was it?

"A. When I stayed there in 1924 that fence was there and I kept up that fence on the east side to protect the crop.

"Q. Now, that fence was there many years before 1924, was it?

"A. Yes.

"Q. I will ask you again if that fence is not what Humphrey and his wife claimed to be their east line?

"A. Yes, sir.

* * *

"Q. And they claimed that as their east line ever since they had the fence there and since they have been on that place?

"A. Yes, sir; that is, since I have been around there.

"Q. Well, that has been many years, hasn't it?

"A. Yes, sir.

"Q. Thirty or forty years?

"A. I haven't known about that time that long, but I have knowed about the place, the one they had claimed under and that was in their field.

"Q. They had their inclosed by that fence on the east side where the road is now, did for many years to your knowledge?

"A. Yes.

"Q. And were claiming that fence as their east line, is that right?

"A. Well, yes, sir; they claimed that as their east line."

■ This evidence does not raise the issue that Lockhart had not been claiming the land upon which he had brought up his family. The testimony of Walter Beall, instead of showing absence of claim during the long period of Lackhart's possession, clearly shows the contrary. The statement that, "If I am over, Mr. Beall, I will move over," is not a recognition of ownership in someone else, but is, in effect, an affirmance of a past claim of ownership. The testimony of the witness Taylor certainly goes no further than that of the witness Beall. In fact, this witness testified that Humphrey Lockhart and wife claimed the fence to be their E. line, and he nowhere testified that during the long period of their occupancy they had not been claiming title to this land.

The Lockharts were not mere squatters holding no character of title. For 12 or 13 years prior to the first conversation testified about they were in possession under a deed purporting to convey absolute title. Their possession is referable to the deed and was clearly hostile. It will be presumed that they were claiming the land covered by their deed and that presumption cannot be destroyed by testimony of the nature of that given by these witnesses. Merriman v. Blalack, 57 Texas Civ. App., 270, 122 S. W., 403; Cannon v. Producers Oil Co., 138 S. W., 803; Sanders v. Moore, 157 S. W., 441; Foster v. Persinger, 30 S. W. (2d) 378.

When a title by limitation is once perfected, the acknowledgement thereafter of ownership in another is of no effect. Lockhart and wife had been in open, peaceable, continuous, adverse possession of this land for a sufficient time to ripen their title by limitation before any of these claimed conversations took place. The legal effect of these facts cannot be destroyed by later declarations that they were not then claiming it. At

most, the evidence showed no more than a verbal relinquishment of Lockhart's claim made after title had vested in him by limitation. Title acquired by limitation can no more be lost by a verbal relinquishment than one acquired by deed. Bruce v. Washington, 80 Texas, 368, 15 S. W., 1104; Bracken v. Jones, 63 Texas, 184; Cook's Hereford Cattle Co. v. Barnhart, 147 S. W., 1; Cannon v. Oil Co., 138 S. W., 803.

It is our conclusion that title by limitation was established by defendants as a matter of law; that no evidence in the record raised any issuable fact with reference thereto; that there is no suggestion, from a consideration of the record as a whole, that as to this question, the case has not been fully developed. Accordingly, the judgments of the district court and Court of Civil Appeals will both be reversed and judgment here rendered that plaintiffs take nothing.

Opinion adopted by the Supreme Court November 12, 1936.
Rehearing overruled January 20, 1937.